Saranne E. Weimer, Esq. (908482012)
**S. WEIMER LAW, LLC**
101 Crawfords Corner Road, Suite 4116
Holmdel, NJ 07733
Phone: (732) 631-3756
Fax: (732) 398-6066

Jonathan I. Kravis
Van A. Carver
Charlotte U. Keeley
**LIU SHUR KRAVIS LLP**
607 Fourteenth Street
Washington, D.C. 20005
Phone: (202) 240-7100

*Attorneys for Plaintiff*
*Sun Pharmaceutical Industries Inc.*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| SUN PHARMACEUTICAL INDUSTRIES INC.,<br><br>Plaintiff,<br><br>v.<br><br>SAFREL PHARMACEUTICALS, LLC; NEEYAAN LLC; and DIPEN PATEL,<br><br>Defendants. | Civil Action No. ___________<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Sun Pharmaceutical Industries Inc. ("Plaintiff" or "Sun Pharma"), by and through its undersigned attorneys, brings this Complaint against Defendants Safrel Pharmaceuticals, LLC ("Safrel"), Neeyaan LLC ("Neeyaan"), and Dipen Patel (collectively, the "Defendants") and, in support thereof, alleges as follows:

## INTRODUCTION

1. Sun Pharma is a large, global pharmaceutical company. Over the past four decades, it has established a brand that consumers and distributors know and trust.

2. Among Sun Pharma's best-selling products is Cetirizine Hydrochloride ("Cetirizine"), a Food and Drug Administration ("FDA") approved oral, over-the-counter ("OTC") generic antihistamine used to treat allergy symptoms that is the generic equivalent of Zyrtec®.

3. Sun Pharma's Cetirizine tablet is easily recognizable from its unique design—a white film coated, rounded-off rectangular tablet bearing the FDA-registered debossed imprint, "RI52."

4. Upon information and belief, Defendants have unlawfully manufactured counterfeit versions of Sun Pharma's Cetirizine tablets, using a custom tablet press to replicate Sun Pharma's registered imprint and fraudulently using certain batch documentation that Defendants obtained through purchases of Sun Pharma's product from a third party.

5. Defendants' conduct is not only deceptive and fraudulent, it is also dangerous. Upon information and belief, Defendants have manufactured counterfeit versions of Sun Pharma's Cetirizine tablets without any of the required FDA oversight, Abbreviated New Drug Application ("ANDA") approval, or Good Manufacturing Practices ("cGMP") quality controls that govern Sun Pharma's own production of the genuine product.

6. Sun Pharma brings this lawsuit for trade dress infringement, unfair competition, breach of contract, unjust enrichment, conversion, violations of the New Jersey Consumer Fraud Act, and common law fraud to stop Defendants from deceiving and harming consumers, distributors, and pharmacies and damaging the brand that Sun Pharma has spent decades building.

## NATURE OF THE ACTION

7. This is a civil action for unfair competition and false designation of origin under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); unfair competition and false designation of origin under the laws of the State of New Jersey, N.J.S.A. 56:4-1 and New Jersey common law; common law breach of contract; common law unjust enrichment; common law conversion; violation of the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1 et seq.; and common law fraud.

8. Plaintiff seeks compensatory and statutory damages, disgorgement of all ill-gotten gains and profits, attorney's fees and costs, and all other relief this Court deems just and proper.

## THE PARTIES

9. Plaintiff, Sun Pharma, is a global pharmaceutical company with its United States headquarters at 2 Independence Way, Princeton, New Jersey 08540.

10. Upon information and belief, Defendant Safrel is a manufacturer and supplier of OTC pharmaceuticals and dietary supplements and maintains its principal place of business at 178 Ridge Road, Dayton, New Jersey 08810, which is located within this judicial district.

11. Upon information and belief, Defendant Neeyaan distributes, manufactures, and packages OTC and specialty pharmaceuticals and maintains its principal place of business at 4 Corporate Drive, Cranbury, New Jersey 08512, which is located within this judicial district.

12. Upon information and belief, Dipen Patel is the Chief Executive Officer of both Safrel and Neeyaan. Upon information and belief, Patel directed, controlled, and personally participated in the acts of counterfeiting, unfair competition, and breach of contract alleged herein.

13. Upon information and belief, Patel also authorized and directed the acquisition of custom tablet presses from Natoli Engineering tooled to reproduce the "RI52" debossed imprint, supervised or had direct knowledge of the counterfeit manufacturing operations at Neeyaan's

Cranbury, New Jersey facility, and directed that Sun Pharma's legitimate lot numbers and Certificates of Analysis ("COA") be affixed to Defendants' counterfeit products. Patel is also the individual who negotiated purchase orders with Sun Pharma on behalf of Safrel, directed that shipments be routed through intermediaries, and made material misrepresentations to Sun Pharma regarding Safrel's payment obligations.

## JURISDICTION AND VENUE

14. This Court has subject matter jurisdiction over the federal claims asserted herein pursuant to 28 U.S.C. § 1331, as this action arises under the Lanham Act, 15 U.S.C. § 1051 et seq.

15. This Court has supplemental jurisdiction over Plaintiff's claims under the laws of the State of New Jersey pursuant to 28 U.S.C. § 1367(a), because the state law claims are so related to the federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

16. This Court has personal jurisdiction over Safrel because its contacts with the State of New Jersey are sufficiently continuous and systematic as to render it at home in this forum, including because, upon information and belief, it has its principal place of business in the State of New Jersey; it manufactures pharmaceuticals at a facility in New Jersey; it has transacted business in the State of New Jersey, including by entering into a contractual relationship with a New Jersey-based company, negotiating and performing pursuant to that contractual relationship through ongoing communications directed to New Jersey, and transmitting representations and other communications into New Jersey; and it sells pharmaceuticals in New Jersey, either directly or indirectly through its subsidiaries, agents, or affiliates, including Neeyaan.

17. This Court has personal jurisdiction over Neeyaan because its contacts with the State of New Jersey are sufficiently continuous and systematic as to render it at home in this forum,

including because, upon information and belief, it has its principal place of business in the State of New Jersey and it has transacted business in the State of New Jersey by selling pharmaceuticals in the state, either directly or indirectly through its subsidiaries, agents, or affiliates.

18. This Court has personal jurisdiction over Patel because, upon information and belief, he has purposefully directed his activities toward and availed himself of the benefits of the State of New Jersey, including because he serves as the Chief Executive Officer of Safrel and Neeyaan, both of which are headquartered and maintain their principal places of business in New Jersey; he personally negotiated contracts and purchase orders with Sun Pharma, a New Jersey-based company, on behalf of Safrel; he directed, controlled, and personally participated in the acts of counterfeiting, unfair competition, and breach of contract alleged herein, which were carried out through his New Jersey facilities; and he transmitted material misrepresentations and communications into New Jersey in furtherance of the alleged wrongful conduct.

19. Plaintiff's claims arise directly out of and relate to the Defendants' forum contacts. The exercise of personal jurisdiction over Defendants is therefore consistent with traditional notions of fair play and substantial justice.

20. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and (c) because Defendants reside in, are organized under the laws of, and transact business in the State of New Jersey, and/or a substantial part of the events giving rise to the claim occurred in this judicial district. Among other things, Defendants manufactured, sold, and/or performed material aspects of their counterfeit operations through their New Jersey locations. Furthermore, the parties negotiated, entered into, and/or performed material aspects of the agreements at issue through their New Jersey offices. Defendants directed communications and contractual representations into New

Jersey, payments were transmitted to/from New Jersey, and Plaintiff suffered the injuries giving rise to its claims in New Jersey.

**FACTUAL BACKGROUND**

21. Founded in 1983 with five products and a two-person marketing team, Sun Pharma has grown into the world's fourth-largest specialty generic pharmaceutical company, serving over 100 countries. The company focuses on three core areas: (1) innovative medicines; (2) generics; and (3) consumer healthcare.

22. Sun Pharma has established itself as a brand that consumers and distributors trust, as reflected in its annual revenue exceeding $6.5 billion for Fiscal Year 2026. Sun Pharma has also received widespread industry recognition, including its recognition by the AmbitionBox Employee Choice Awards as a top-rated pharmaceutical company and the Sustainability & Health Honors as a top 5% global pharmaceutical company.

23. Sun Pharma manufactures, markets, and/or sells more than 201 medications approved by the FDA in the United States.

24. Ohm Laboratories, Inc. ("Ohm") is a subsidiary of Sun Pharma, specializing in the manufacturing and packaging of OTC and prescription pharmaceutical products. Its core products and services include: (1) gastrointestinal medications; (2) cough and cold medications; (3) internal analgesics; and (4) allergy medications.

25. Taro Pharmaceuticals ("Taro") is a subsidiary of Sun Pharma. It develops, manufactures and markets affordable prescription, generic, and OTC medications.

**Sun Pharma's Cetirizine Tablets**

26. Sun Pharma manufactures, markets, and sells high-quality generic medicines, including 10 mg Cetirizine tablets—a generic antihistamine used to treat allergy symptoms.

27. In 2007, the FDA approved Sun Pharma's ANDA No. 077498—the regulatory pathway through which the FDA evaluates and approves generic drugs for sale in the United States—allowing Sun Pharma to manufacture, market, and sell Cetirizine tablets identified by the National Drug Code 51660-939.

28. In reviewing and approving ANDAs, the FDA requires applicants to show: (1) the generic drug is "pharmaceutically equivalent" to the brand-name drug; (2) the manufacturer of the generic drug is capable of making it correctly; (3) the manufacturer of the generic drug is capable of making it consistently; (4) the "active ingredient" of the generic drug is the same as that of the brand-name drug; (5) the right amount of the active ingredient gets to the place in the body where it has effect; (6) the "inactive" ingredients of the generic drug are safe; (7) the generic drug does not break down over time; (8) the container in which the generic drug will be shipped and sold is appropriate; (9) the label for the generic drug is the same as the brand-name drug's label; and (10) relevant patents or legal exclusivities are expired.[1]

29. Accordingly, before Sun Pharma could market and sell Cetirizine tablets, it had to submit detailed information to the FDA, and the FDA had to extensively review and evaluate the product against each of the criteria described above and ultimately approve the ANDA covering the tablets.

30. Additionally, 21 C.F.R. § 206.10(a) requires any tablet or capsule that contains an approved drug substance in finished dosage form to be "clearly marked or imprinted with a code

[1] FDA Fact Sheet: What's Involved in Reviewing and Approving Generic Drug Applications?, FOOD AND DRUG ADMINISTRATION, https://www.fda.gov/media/99163/download (last visited Sept. 2, 2026).

imprint in conjunction with the product's size, shape, and color, permits the unique identification of the drug product and the manufacturer or distributor of the product" before it can be introduced into interstate commerce. 21 C.F.R. § 206.10(c) cautions that a drug product that does not meet the requirement for imprinting may be considered "adulterated and misbranded and may be an unapproved new drug." Drug manufacturers, like Sun Pharma, are required to register their drugs with the FDA through the Electronic Drug Registration and Listing System ("eDRLS"). The listing information must include the drug's size, shape, color, scoring, and code imprint, all of which the FDA approves during the ANDA process.

31. Sun Pharma's Cetirizine is offered as a 5 mg tablet and as a 10 mg tablet. Each tablet has a unique combination of size, shape, color, and imprint. As relevant here, the 10 mg tablet is a white film coated, rounded-off rectangular tablet measuring 0.3550 inch x 0.2200 inch and bearing the unique FDA-registered debossed imprint "RI52" (the "Sun Pharma Trade Dress").



[2]

32. The Sun Pharma Trade Dress is entirely arbitrary and non-functional. The specific combination of color, shape, size, and imprint of Sun Pharma's 10 mg Cetirizine tablet serves no medical, pharmaceutical, or manufacturing purpose. Its sole function is to uniquely identify the

[2] RI52 Pill: White Rectangle 9mm – Pill Identifier, DRUGS.COM, https://www.drugs.com/imprints/ri52-19420.html (last visited Sept. 2, 2026).

source of the tablet, enabling consumers and distributors to ascertain the product's origin and manufacturer.

33. Although the FDA requires that each oral solid dosage form bears a unique imprint under 21 C.F.R. § 206.10 and eDRLS, it does not dictate any specific imprint. Nor does the FDA prescribe the color, shape, or size of a tablet. Sun Pharma independently selected the "RI52" debossing, and the particular combination of white film coated tablets, rounded-off rectangular shape, and 0.3550 x 0.2200 inch size from among numerous available alternatives. No medical, pharmaceutical, or manufacturing consideration required this specific combination.

34. According to www.drugs.com—a widely recognized source of peer-reviewed, comprehensive, and up-to-date drug information—there are approximately 91 distinct versions of 5 mg and 10 mg Cetirizine tablets, each featuring its own unique combination of size, shape, and imprint. No two versions are exactly alike. This wide variety of shapes, sizes, and imprints among competing Cetirizine tablets demonstrates that the Sun Pharma Trade Dress serves no functional purpose; rather, it functions solely as a source identifier. The following are illustrative, non-exhaustive examples of other manufacturers' unique 10 mg Cetirizine tablets:



[3]

[3] 4H2 Pill: White, Oval, 10 mm – Pill Identifier, DRUGS.COM, https://www.drugs.com/imprints/4h2-11140.html (last visited Sept. 28, 2026).



[4]



[5]



[6]

4 CTN 10 Pill: White, Barrel, 8 mm – Pill Identifier, DRUGS.COM, https://www.drugs.com/imprints/ctn-10-15922.html (last visited Sept. 28, 2026).

5 M C37 Pill: White, Round, 8 mm – Pill Identifier, DRUGS.COM, https://www.drugs.com/imprints/m-c37-11718.html (last visited Sept. 28, 2026).

6 RB 80 Pill: White, Round – Pill Identifier, DRUGS.COM, https://www.drugs.com/imprints/rb-80-15923.html (last visited Sept. 28, 2026).



[7]

35. Cetirizine tablets manufactured by Sun Pharma, bearing the Sun Pharma Trade Dress, have been continuously sold in interstate commerce throughout the United States, including the State of New Jersey, since the FDA approved ANDA No. 077498 in 2007.

36. In accordance with FDA cGMP, Sun Pharma issues a lot number and COA with each and every Cetirizine shipment, verifying that the particular batch meets predetermined safety, purity, and composition specifications.

37. Consumers and distributors who purchase Sun Pharma Cetirizine tablets know they are buying quality, FDA-approved, generic pharmaceutical products when they receive a lot number (for consumers) or a lot number and COA (for distributors) in accordance with cGMP.

**Defendants' Counterfeit Cetirizine Tablets**

38. Upon information and belief, Defendants are manufacturing counterfeit versions of Plaintiff's 10 mg Cetirizine tablet—each a white film coated, rounded-off rectangular tablet bearing the Sun Pharma FDA-registered debossed imprint "RI52"—out of the Neeyaan manufacturing facility located at 4 Corporate Drive, Cranbury, New Jersey 08512, without the

[7] J 220 Pill: White, Rectangle, 9 mm – Pill Identifier, DRUGS.COM, https://www.drugs.com/imprints/j-220-34772.html (last visited Sept. 28, 2026).

required FDA oversight, ANDA approval, or cGMP quality controls that govern Sun Pharma's own production of the genuine product.

39. Upon information and belief, Defendants are offering for sale in the State of New Jersey and the United States a counterfeit version of Plaintiff's 10 mg Cetirizine tablet.

40. Upon information and belief, Defendants are unlawfully utilizing the exact, or confusingly similar, size, shape, color, and debossed imprint that constitute the Sun Pharma Trade Dress to manufacture and sell counterfeit versions of Sun Pharma's 10 mg Cetirizine tablet throughout New Jersey and the United States, thereby passing off their unapproved product as genuine Sun Pharma Cetirizine to unsuspecting consumers, pharmacies, and distributors.

41. Upon information and belief, Defendants deliberately commissioned and purchased custom tablet presses from Natoli Engineering, a manufacturer of pharmaceutical tooling, specifically designed to reproduce the unique FDA-registered debossed imprint "RI52," and are using those presses to mass produce counterfeit Cetirizine tablets that are indistinguishable in appearance from Sun Pharma's genuine product.

42. Defendants' actions are without the approval or consent of Sun Pharma.

43. Upon information and belief, Defendants' formulation for their Cetirizine tablet is substantially different from the FDA-approved formulation for the Sun Pharma Cetirizine tablet.

44. Upon information and belief, after manufacturing the counterfeit Cetirizine tablets, Defendants used Sun Pharma's legitimate lot numbers and COAs—obtained through legitimate Cetirizine purchase orders from Sun Pharma, as set out in "The Contractual Relationship Between Sun Pharma and Safrel," *infra*—to create a veneer of legitimacy for their counterfeit products to deceive consumers and distributors alike.

45. Upon information and belief, Defendants acted with full knowledge of Plaintiff's rights in the Sun Pharma Trade Dress for Cetirizine tablets and deliberately counterfeited its appearance to take advantage of its associated reputation and goodwill, while also circumventing the rigorous FDA ANDA approval process.

46. As a result of Defendants' counterfeiting scheme, consumers and distributors who encounter quality issues with Defendants' counterfeit Cetirizine tablets—including product failure, adverse side effects, and/or contamination resulting from unregulated manufacturing—will attribute those issues to Sun Pharma. This misattribution threatens to erode Sun Pharma's hard-earned reputation as a trusted provider of high-quality medicines, deprive Sun Pharma of the ability to control the quality and integrity of products bearing the Sun Pharma Trade Dress, and cause Sun Pharma to suffer lost sales and diminished market share.

47. Defendants' conduct constitutes a deliberate scheme to deceive consumers, pharmacies, and distributors, and poses a serious risk to public health given the absence of any FDA oversight, ANDA approval, or cGMP quality controls with respect to the counterfeit product.

**The Relationship Between Safrel and Marlex**

48. Before Safrel began purchasing directly from Sun Pharma in its own name, as set out *infra*, Safrel and Neeyaan obtained genuine Sun Pharma bulk tablets through an indirect purchasing channel. Safrel and/or Neeyaan would place orders through One Dream Nutrients ("One Dream"), which in turn submitted purchase orders to Sun Pharma, through Ohm and/or Taro, directing that shipments be consigned to Marlex Pharmaceuticals ("Marlex").

49. Upon information and belief, One Dream assists companies with moving products to market, and advises pharmaceutical manufacturing companies on operational planning and efficiencies.

50. Upon information and belief, One Dream maintains its principal place of business at 5 Centerpointe Drive, Suite 240, Lake Oswego, Oregon 97035.

51. Upon information and belief, Marlex markets, manufactures, packages, and distributes generic, consumer, and specialty pharmaceuticals, including to government purchasers.

52. Upon information and belief, Marlex maintains its principal place of business at 65 Lukens Drive, New Castle, Delaware 19720.

53. Upon information and belief, Defendants used Marlex as a pass-through intermediary to acquire genuine Sun Pharma tablets in order to obtain the batch documentation (lot numbers and COAs) necessary to lend an appearance of legitimacy to their counterfeit operations.

54. In addition to Cetirizine, Sun Pharma also supplied Safrel with Loratadine 10 mg tablets—another generic antihistamine—through Ohm. Though not the subject of the counterfeiting claims at issue in this action, Loratadine is relevant to Safrel's breach of contract, as discussed further *infra*.

55. Between January 2023 and October 2024, Sun Pharma, through Ohm, repeatedly shipped bulk lots of Cetirizine and Loratadine 10 mg tablets sold to One Dream but consigned to Marlex in New Castle, Delaware under Purchase Order Nos. 22-0104, 23-0046, 23-0126, 23-0165, and 23-0187.

56. Upon information and belief, the tablets consigned to Marlex did not remain with Marlex. Sun Pharma's records for Purchase Order No. 23-0126, covering Cetirizine Batch Nos. AD28011 and AD28012, identify Marlex as the ship-to party on the purchase order but Neeyaan, at 4 Corporate Drive, Cranbury, New Jersey 08512, as the ship-to party on the invoice—the same

facility at which, upon information and belief, Defendants manufacture the counterfeit Cetirizine tablets.

57. Safrel continued to use Marlex as an intermediary even after Safrel began purchasing Cetirizine and Loratadine directly: Purchase Order No. 23-0196, issued by Patel for 19,500,000 Cetirizine and 5,400,000 Loratadine tablets, directed shipment to Marlex in Delaware rather than to either of Safrel's or Neeyaan's New Jersey facilities.

58. Each bulk shipment routed through the Marlex address carried Sun Pharma's genuine batch documentation, including lot numbers and COAs. Upon information and belief, Defendants used that limited quantity of genuine batches from Sun Pharma, along with the lot numbers and COAs, as documentary cover for their counterfeit operation.

**The Contractual Relationship Between Sun Pharma and Safrel**

59. Sun Pharma, through its wholly owned subsidiaries Ohm and Taro, entered into purchase order agreements with Safrel, including Purchase Order No. 23-0196 and Purchase Order No. 23-0204 (collectively, the "Purchase Orders").

60. Under the Purchase Orders, Sun Pharma agreed to manufacture and deliver bulk pharmaceutical tablets to Safrel or its designees, and Safrel agreed to pay for all goods delivered within the time and in the manner specified in the purchase orders.

61. On or about January 7, 2025, Sun Pharma issued Invoice No. 99953681 to Safrel in connection with Purchase Order No. 23-0196. The invoice reflected one bulk shipment of Cetirizine 10 mg tablets, Batch No. AD63070, to Marlex Pharmaceuticals, totaling 3,817,350 tablets, for a total invoiced amount of $54,397.24. The shipment was dispatched via J&B Trucking (tracking number J&B-120622024-OHM) to 65 Lukens Drive, New Castle, Delaware 19720, with

delivery scheduled for January 20, 2025. The shipment was delivered to and accepted by Safrel's designee, Marlex, without objection.

62. On or about January 7, 2025, Sun Pharma issued Invoice No. 99953682 to Safrel in connection with Purchase Order No. 23-0196. The invoice reflected one bulk shipment of Loratadine 10 mg tablets, Batch No. AD66662, to Marlex Pharmaceuticals, totaling 5,269,739 tablets, for a total invoice amount of $69,824.04. The shipment was dispatched via J&B Trucking (tracking number J&B-12112024-OHM) to 65 Lukens Drive, New Castle, Delaware 19720, with delivery scheduled for January 20, 2025. The shipment was delivered to and accepted by Safrel's designee, Marlex, without objection.

63. On or about January 9, 2025, Sun Pharma, by and through its subsidiaries Ohm and/or Taro, issued Invoice No. 99954880 to Safrel in connection with Purchase Order No. 23-0196. The invoice reflected four bulk shipments of Cetirizine 10 mg tablets, Batch Nos. AD63068, AD63071, AD71061, and AD71066, to Marlex Pharmaceuticals totaling 15,226,698 tablets, for a total invoice amount of $216,980.45. The shipment was dispatched via J&B Trucking (tracking number 01092025-OHM-JB) to 65 Lukens Drive, New Castle, Delaware 19720, with delivery scheduled for January 20, 2025. The shipment was delivered to and accepted by Safrel's designee, Marlex, without objection.

64. On or about March 28, 2025, Sun Pharma, by and through its subsidiaries Ohm and/or Taro, issued Invoice No. 99975055 to Safrel in connection with Purchase Order No. 23-0204. The invoice reflected two bulk orders of Loratadine 10 mg tablets, Batch Nos. AD74104 and AD74105, to Safrel totaling 10,341,235 tablets, for a total invoice amount of $137,021.36. The orders were picked up by Safrel without objection.

65. On or about February 19, 2025, Safrel remitted a payment to Sun Pharma, via Ohm, in the amount of $54,397.24 for Invoice No. 99953681, but has paid nothing further.

66. Plaintiff performed all material conditions, covenants, and obligations required of it under the Purchase Orders.

**Safrel's Breach of Contract**

67. Safrel materially breached its obligations under the Purchase Orders by failing and refusing to pay for the Cetirizine and Loratadine bulk tablets it ordered and received. The total amount due under the Purchase Orders was $478,223.09. Safrel remitted a single payment to Sun Pharma in the amount of $54,397.24 and has paid nothing further.

68. To date, Safrel has an outstanding balance of $423,825.85 owed to Sun Pharma.

69. On or about March 28, 2025—the same day Ohm issued Invoice No. 99975055—Sun Pharma sent the invoice bearing number "0099975055" to Patel at Safrel. Later that same day, Patel responded by representing that Safrel had previously sent a check and that the check had been cashed. When Sun Pharma followed up on March 31, 2025, inquiring whether the check had in fact cleared, Safrel maintained that the check "was sent a while back along with the other payment that was cleared." Sun Pharma never received the check Safrel claimed to have sent.

70. On or about April 1, 2025, Sun Pharma requested an update on the payment and advised Safrel that Sun Pharma had yet to receive the check. Safrel did not respond.

71. On or about April 10, 2025, Sun Pharma notified Safrel that its "account is extremely past due and require[s] your immediate attention to prevent future escalation," and requested "payment details for the outstanding balance of $423,825.85." Safrel again failed to respond.

72. On or about April 22, 2025, Sun Pharma advised Safrel that "a hold was placed on [its] account for non-payment of the past due balance at $423,825.85." That same day, Sun Pharma further notified Safrel: "The Loratadine BULK has been released, however, shipment is being held up due to non-payment of the attached invoices."[8] Safrel did not respond.

73. On or about July 9, 2025, Sun Pharma again contacted Safrel, "following up again to check on the status of [Safrel's] account, and payment of the open OHM invoices," and requesting that Safrel "please advise the latest status of the business." On July 10, 2025, Patel responded on behalf of Safrel: "Yes I am going to start working on the payment. We are just waiting on [a] line of credit. You should start seeing payments come through soon." Despite this representation, Sun Pharma never received any further payments from Safrel.

74. On or about January 14, 2026, Sun Pharma sent a formal demand letter to Patel at Safrel, demanding payment of $423,825.85, the full outstanding balance owed by Safrel to Sun Pharma for the purchase of Loratadine and Cetirizine, and requiring that such payment be made no later than January 29, 2026.

75. Safrel did not respond to the demand letter, did not remit payment by January 29, 2026, and has made no payment whatsoever since its partial payment of $54,397.24. To date, the full amount of $423,825.85 remains due.

76. Upon information and belief, Safrel's failure to pay was undertaken with knowledge that its obligations under the purchase orders remained outstanding. Safrel's representative, Patel, repeatedly acknowledged the debt, promised payment, and failed to follow

[8] All shipments under the two relevant outstanding purchase orders (Nos. 23-0196 and 23-0204) were sent by Sun Pharma, received, picked up, and/or accepted by Safrel or its designee, Marlex. Following Safrel's failure to remit payment, Sun Pharma placed a hold on Safrel's account, suspending any future Cetirizine and Loratadine shipments until the outstanding balance was paid in full. Safrel never made such payment.

through—a pattern of conduct demonstrating that Safrel's nonpayment was not the product of inadvertence or good-faith dispute.

## CAUSES OF ACTION

### COUNT I

**Unfair Competition and False Designation of Origin**
**Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)**
**(Against All Defendants)**

77. Plaintiff repeats and realleges each allegation set forth in the preceding paragraphs as though fully set forth herein.

78. Plaintiff's Sun Pharma Trade Dress is valid, used in commerce in the United States, and has inherent and acquired distinctiveness. Since the FDA's approval of ANDA No. 077498 in 2007, Sun Pharma has continuously and exclusively used the Sun Pharma Trade Dress on its 10 mg Cetirizine tablets sold throughout the United States. During that period, Sun Pharma has sold millions of Cetirizine tablets bearing the Sun Pharma Trade Dress to pharmacies, distributors, and consumers nationwide. The Sun Pharma Trade Dress has become associated in the minds of consumers, pharmacies, and distributors with Sun Pharma as the source of those tablets.

79. Upon information and belief, without authorization from Sun Pharma, Defendants have used, and will continue to use a trade dress confusingly similar, if not identical, to the Sun Pharma Trade Dress on consumer-facing materials in commerce in connection with their counterfeit Cetirizine operation.

80. Plaintiff's use of the Sun Pharma Trade Dress on its Cetirizine tablets predates any use of the counterfeit trade dress by Defendants.

81. Upon information and belief, Defendants' conduct as alleged herein is willful and is intended to and is likely to cause confusion, mistake, or deception as to the affiliation, connection, or association of Defendants with Plaintiff.

82. Defendants' unauthorized use in commerce of a trade dress confusingly similar, if not identical, to the Sun Pharma Trade Dress as alleged herein constitutes use of a false designation of origin and misleading description and representation of fact.

83. Defendants' conduct as alleged herein constitutes unfair competition and false designation of origin in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

84. As a direct and proximate result of Defendants' use of a trade dress confusingly similar, if not identical, to the Sun Pharma Trade Dress, Plaintiff is likely to suffer irreparable injury to the reputation of Sun Pharma, as well as to the goodwill developed by Sun Pharma for its pharmaceuticals. The extent of this harm cannot be ascertained at this time.

85. As a direct and proximate result of Defendants' unauthorized use of a trade dress confusingly similar, if not identical, to the Sun Pharma Trade Dress, Plaintiff is likely to suffer economic injury through lost sales and price erosion of its 10 mg Cetirizine tablets and loss of share in the generic allergy medication market. The extent of this harm cannot be ascertained at this time.

86. Defendants' counterfeit use of a trade dress confusingly similar, if not identical, to the Sun Pharma Trade Dress is intentional, willful, and in bad faith. Despite knowing that they had not obtained approval through the FDA's ANDA process—as legally required of all generic pharmaceuticals—and that Plaintiff had never authorized Defendants to use the debossed tablet imprint "RI52," Defendants knowingly adopted a trade dress confusingly similar, if not identical, to the Sun Pharma Trade Dress. Defendants did so for the express purpose of passing off their

counterfeit product as the genuine Sun Pharma 10 mg Cetirizine tablet, thereby deceiving consumers and the marketplace. Defendants' bad faith is further evinced by the fact that they used lot numbers and COAs that they had previously received from Sun Pharma in connection with legitimate purchase orders for 10 mg Cetirizine tablets, and affixed that legitimate documentation to their counterfeit product in order to make it appear genuine.

87. By reason of the foregoing, Plaintiff is entitled to, among other relief, an award of actual damages, Defendants' profits, enhanced damages and profits, reasonable attorneys' fees, and costs of the action under Sections 34 and 35 of the Lanham Act, 15 U.S.C. §§ 1116, 1117, together with prejudgment and post-judgment interest.

## COUNT II

**Trade Dress Infringement**
**Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)**
**(Against All Defendants)**

88. Plaintiff repeats and realleges each allegation set forth in the preceding paragraphs as though fully set forth herein.

89. Plaintiff has registered valid trade dress rights, including the tablet imprint, with the FDA regarding the Sun Pharma Trade Dress.

90. The Sun Pharma Trade Dress is used in commerce in the United States.

91. The Sun Pharma Trade Dress is non-functional, is inherently distinctive, and has acquired secondary meaning in the marketplace.

92. Defendants, without authorization from Plaintiff, have used and will continue to use a trade dress confusingly similar, if not identical, to the Sun Pharma Trade Dress in commerce, passing their product off as a Sun Pharma product even though it is counterfeit.

93. Defendants' use of a trade dress confusingly similar, if not identical, to the Sun Pharma Trade Dress is likely to cause confusion, mistake, and deception among consumers as to whether Defendants' counterfeit Cetirizine is Sun Pharma's Cetirizine.

94. Defendants' acts constitute trade dress infringement in violation of Section 43(a) of the Lanham Act (15 U.S.C. § 1125(a)).

95. As a direct and proximate result of Defendants' use of a trade dress confusingly similar, if not identical, to the Sun Pharma Trade Dress, Plaintiff is likely to suffer irreparable injury to its reputation, as well as to the goodwill it has developed for its pharmaceuticals. The extent of this harm cannot be ascertained at this time.

96. As a direct and proximate result of Defendants' use of a trade dress confusingly similar, if not identical, to the Sun Pharma Trade Dress, Plaintiff is likely to suffer economic injury through lost sales and price erosion of its 10 mg Cetirizine tablets and loss of share in the generic allergy medication market. The extent of this harm cannot be ascertained at this time.

97. Defendants' use of a trade dress confusingly similar, if not identical, to the Sun Pharma Trade Dress is intentional, willful, and in bad faith, as evinced by the fact that Defendants knowingly adopted a trade dress blatantly copying the Sun Pharma Trade Dress and providing purchasers with lot numbers and COAs that Defendants had legitimately obtained from Sun Pharma in connection with prior purchase orders, in a deceptive manner designed to pass off their counterfeit Cetirizine tablets as Sun Pharma's Cetirizine tablets.

98. By reason of the foregoing, Plaintiff is entitled to, among other relief, an award of actual damages, Defendants' profits, enhanced damages and profits, reasonable attorneys' fees, and costs of the action under Sections 34 and 35 of the Lanham Act, 15 U.S.C. §§ 1116, 1117, together with prejudgment and post-judgment interest.

## COUNT III

**Unfair Competition and False Designation of Origin**
**N.J.S.A. 56:4-1 and Common Law**
**(Against All Defendants)**

99. Plaintiff repeats and realleges each allegation set forth in the preceding paragraphs as though fully set forth herein.

100. Plaintiff has registered valid trade dress rights, along with the debossed tablet imprint, with the FDA regarding the Sun Pharma Trade Dress.

101. The Sun Pharma Trade Dress is used in commerce in New Jersey.

102. The Sun Pharma Trade Dress is non-functional, is inherently distinctive, and has acquired secondary meaning in the marketplace.

103. Defendants, without authorization from Plaintiff, have used and will continue to use a trade dress confusingly similar, if not identical, to the Sun Pharma Trade Dress in commerce, passing their product off as a Sun Pharma product even though it is counterfeit.

104. Defendants' use of a trade dress confusingly similar, if not identical, to the Sun Pharma Trade Dress is likely to cause confusion, mistake, and deception among consumers as to whether Defendants' counterfeit Cetirizine is Sun Pharma's Cetirizine.

105. Defendants' acts constitute trade dress infringement in violation of N.J.S.A. 56:4-1.

106. As a direct and proximate result of Defendants' use of a trade dress confusingly similar, if not identical, to the Sun Pharma Trade Dress, Plaintiff is likely to suffer irreparable injury to its reputation, as well as to the goodwill it has developed for its pharmaceuticals. The extent of this harm cannot be ascertained at this time.

107. As a direct and proximate result of Defendants' use of a trade dress confusingly similar, if not identical, to the Sun Pharma Trade Dress, Plaintiff is likely to suffer economic injury through lost sales and price erosion of its 10 mg Cetirizine tablets and loss of share in the generic allergy medication market. The extent of this harm cannot be ascertained at this time.

108. Defendants' use of a trade dress confusingly similar, if not identical, to the Sun Pharma Trade Dress is intentional, willful, and in bad faith, as evinced by the fact that Defendants knowingly adopted a trade dress blatantly copying the Sun Pharma Trade Dress and provided purchasers with lot numbers and COAs that Defendants had legitimately obtained from Sun Pharma in connection with prior purchase orders, in a deceptive manner designed to pass off their counterfeit Cetirizine tablets as Sun Pharma's Cetirizine tablets.

109. By reason of the foregoing, Plaintiff is entitled to recover all damages, whether direct or indirect, proven to have been caused by Defendants' aforesaid acts, which damages are subject to trebling.

## COUNT IV

**Breach of Contract**
**(Against Defendants Safrel and Neeyaan)**
**(alter ego theory)**

110. Plaintiff repeats and realleges each allegation set forth in the preceding paragraphs as though fully set forth herein.

111. Plaintiff further alleges that Neeyaan is the alter ego of Safrel such that the separate corporate personalities of the two companies no longer exist. There is such unity of interest and ownership between Neeyaan and Safrel that adhering to the fiction of their separate existence would sanction fraud or injustice.

112. Defendant Neeyaan is similarly liable for the contract claim under the alter ego theory, because among other things: (1) as alleged above, Patel serves as the Chief Executive Officer of both Safrel and Neeyaan; (2) as alleged above, both companies participated substantially, and commingled operations, in the counterfeiting operation alleged herein, including Neeyaan's use of its Cranbury, New Jersey manufacturing facility to receive legitimate Sun Pharma Cetirizine tablets, and to produce counterfeit Cetirizine tablets bearing a trade dress confusingly similar, if not identical, to the Sun Pharma Trade Dress such that they were indistinguishable; (3) as alleged above, Safrel and Neeyaan used genuine Sun Pharma Cetirizine tablets acquired through the contractual relationship between Sun Pharma and Safrel, along with Sun Pharma's legitimate lot numbers and COAs, as a veneer to legitimize the counterfeit operation; and (4) Safrel's failure to pay the outstanding balance of $423,825.85 owed to Sun Pharma directly facilitated the counterfeiting scheme that both Safrel and Neeyaan carried out.

113. Plaintiff and Defendants Safrel and its alter ego, Neeyaan, entered into valid and enforceable contracts, including Purchase Order No. 23-0196 and Purchase Order No. 23-0204 (collectively, the "Purchase Orders").

114. Pursuant to the Purchase Orders, Defendants Safrel and its alter ego, Neeyaan, agreed to purchase and pay for bulk pharmaceutical tablets—specifically, Cetirizine 10 mg and Loratadine 10 mg—from Plaintiff. The total amount due under the Purchase Orders was $478,223.09, of which $423,825.85 remains unpaid.

115. Plaintiff performed all material conditions, covenants, and obligations required of it under the Purchase Orders. Plaintiff manufactured and delivered all goods ordered under the Purchase Orders in conformity with the agreed-upon specifications.

116. Defendants Safrel and its alter ego, Neeyaan, materially breached the Purchase Orders by, among other things:

a. Failing and refusing to pay for the Cetirizine and Loratadine bulk tablets ordered and delivered under the Purchase Orders, leaving an outstanding balance of $423,825.85;

b. Remitting only a partial payment, and paying nothing further despite repeated demands;

c. Falsely representing to Plaintiff that payment had been sent, when in fact Plaintiff never received any such payment;

d. Promising, through Patel, that payments would be forthcoming, while failing to remit any payment whatsoever; and

e. Failing to respond to Plaintiff's formal demand letter dated January 14, 2026, and failing to cure its nonpayment by the January 29, 2026 deadline set forth therein.

117. As a direct and proximate result of the breaches by Defendants Safrel and its alter ego, Neeyaan, Plaintiff has suffered damages in an amount of not less than $423,825.85, representing the unpaid balance due under the Purchase Orders, an amount to be proven at trial.

## COUNT V

### Unjust Enrichment
### (Against Defendant Neeyaan)

118. Plaintiff repeats and realleges each allegation set forth in the preceding paragraphs as though fully set forth herein.

119. Neeyaan is not a party to the Purchase Orders between Plaintiff and Safrel. No express contract between Plaintiff and Neeyaan governs the subject matter of this Count.

120. As set forth above, upon information and belief, genuine Sun Pharma Cetirizine bulk tablets manufactured by Plaintiff were shipped to Neeyaan's manufacturing facility located at 4 Corporate Drive, Cranbury, New Jersey 08512.

121. Neeyaan received a direct benefit from Plaintiff in the form of those genuine pharmaceutical tablets.

122. Neeyaan has retained the benefit of Plaintiff's genuine tablets without making any payment to Plaintiff.

123. Upon information and belief, Neeyaan used those genuine tablets in furtherance of Defendants' counterfeiting scheme, including to support the manufacture and sale of counterfeit Cetirizine tablets bearing a trade dress confusingly similar, if not identical, to the Sun Pharma Trade Dress. Retention of that benefit without payment is unjust.

124. Plaintiff shipped the tablets expecting to be paid in full for them by any party that received and retained them, and did not intend to confer them gratuitously on anyone, including Neeyaan. Plaintiff did not know that the tablets would be used to facilitate a counterfeiting operation. Had Plaintiff known, it would not have permitted the tablets to be shipped at all.

125. As a direct and proximate result of Neeyaan's unjust enrichment, Plaintiff has suffered damages in an amount to be proven at trial, but not less than the fair market value of the genuine pharmaceutical tablets received by Neeyaan.

## <u>COUNT VI</u>

**Conversion**
**(Against Defendant Neeyaan)**

126. Plaintiff repeats and realleges each allegation set forth in the preceding paragraphs as though fully set forth herein.

127. Plaintiff owned or had a right to possess the genuine Sun Pharma Cetirizine bulk tablets that were shipped to and received by Neeyaan at its manufacturing facility in Cranbury, New Jersey. Neeyaan was not a party to the Purchase Orders and had no contractual right to receive, possess, or use those tablets.

128. Upon information and belief, Neeyaan intentionally exercised unauthorized dominion and control over Plaintiff's genuine Cetirizine tablets in a manner wholly inconsistent with Plaintiff's rights as the owner of those goods. Specifically, Neeyaan received, retained, and used Plaintiff's genuine tablets to facilitate a counterfeiting scheme, including by using the tablets to support the manufacture and sale of millions of counterfeit Cetirizine tablets bearing a trade dress confusingly similar, if not identical, to the Sun Pharma Trade Dress without Plaintiff's authorization or consent.

129. Neeyaan's exercise of dominion over Plaintiff's genuine tablets constituted a serious interference with Plaintiff's rights, including by depriving Plaintiff of the value of those tablets, undermining Plaintiff's ability to control the quality and distribution of products bearing the Sun Pharma Trade Dress, and causing reputational and economic harm to Plaintiff.

130. Neeyaan's dominion over Plaintiff's genuine tablets was unlawful from the outset. Neeyaan had no authorization from Plaintiff, no contractual right under the Purchase Orders, and no other lawful basis to receive, possess, or use the tablets.

131. As a direct and proximate result of Neeyaan's conversion, Plaintiff has suffered damages in an amount to be proven at trial, but not less than the fair market value of the converted tablets at the time of conversion, together with interest from the date of conversion.

## COUNT VII

**Violation of the New Jersey Consumer Fraud Act**
**N.J.S.A. 56:8-1 et seq.**
**(Against All Defendants)**

132. Plaintiff repeats and realleges each allegation set forth in the preceding paragraphs as though fully set forth herein.

133. The New Jersey Consumer Fraud Act ("CFA"), N.J.S.A. 56:8-1 et seq., prohibits any unconscionable commercial practice, deception, fraud, false pretense, false promise, or misrepresentation in connection with the sale or advertisement of any merchandise. N.J.S.A. 56:8-2. The CFA provides a private right of action for treble damages, reasonable attorneys' fees, and costs to any person who suffers an ascertainable loss as a result of an unlawful practice. N.J.S.A. 56:8-19.

134. Defendants' counterfeit Cetirizine tablets constitute "merchandise" within the meaning of the CFA, as they are goods offered, directly or indirectly, to the public for sale. N.J.S.A. 56:8-1(c).

135. Defendants engaged in unlawful practices within the meaning of N.J.S.A. 56:8-2 by manufacturing, marketing, and selling counterfeit Cetirizine tablets bearing a trade dress confusingly similar, if not identical, to the Sun Pharma Trade Dress—including the FDA-registered debossed imprint "RI52"—thereby affirmatively misrepresenting to consumers, pharmacies, and distributors that those tablets were genuine, FDA-approved Sun Pharma products when, in fact, they were not. Defendants further misrepresented the origin, quality, and regulatory status of the counterfeit tablets by affixing Sun Pharma's legitimate lot numbers and COAs to Defendants' counterfeit products.

136. Defendants' conduct also constitutes an unlawful practice under the CFA because Defendants manufactured and sold pharmaceutical tablets without the required FDA oversight, ANDA approval, or cGMP quality controls, in violation of federal pharmaceutical manufacturing regulations, including 21 C.F.R. § 206.10. Defendants' counterfeit tablets, which bear an unauthorized code imprint, may constitute adulterated, misbranded, and unapproved new drugs under federal law. Such regulatory violations constitute per se unlawful practices under the CFA, regardless of Defendants' intent.

137. As a direct and proximate result of Defendants' unlawful practices, Plaintiff has suffered ascertainable losses of money and property, including but not limited to: (1) lost sales and revenue resulting from Defendants' sale of counterfeit Cetirizine tablets that displaced Plaintiff's genuine product in the marketplace; (2) price erosion of Plaintiff's 10 mg Cetirizine tablets and loss of market share in the generic allergy medication market; and (3) harm to the goodwill and reputation that Plaintiff has developed over decades as a trusted provider of FDA-approved pharmaceuticals. These losses are quantifiable and measurable.

138. Defendants' unlawful practices were a proximate cause of Plaintiff's ascertainable losses. By manufacturing and selling counterfeit Cetirizine tablets that were designed to be indistinguishable from Plaintiff's genuine product, Defendants directly diverted sales from Plaintiff and caused consumers and distributors to associate quality failures in the counterfeit product with Plaintiff.

139. By reason of the foregoing, Plaintiff is entitled to treble damages, reasonable attorneys' fees, filing fees, and costs of suit pursuant to N.J.S.A. 56:8-19, together with such other relief as this Court deems just and proper.

## COUNT VIII

**Common Law Fraud**
**(Against Defendant Patel)**

140. Plaintiff repeats and realleges each allegation set forth in the preceding paragraphs as though fully set forth herein.

141. On or about March 28, 2025, Patel, acting on behalf of Safrel, falsely represented to Plaintiff that Safrel had previously sent a check in payment of outstanding invoices and that the check had been cashed. On or about March 31, 2025, when Plaintiff inquired whether the check had cleared, Patel maintained that the check "was sent a while back along with the other payment that was cleared." These representations were false. Plaintiff never received any such check, and no such payment was ever made.

142. On or about July 10, 2025, Patel again made material misrepresentations to Plaintiff, stating: "Yes I am going to start working on the payment. We are just waiting on [a] line of credit. You should start seeing payments come through soon." Despite this representation, Plaintiff never received any further payments from Safrel or Patel.

143. Patel knew or believed that his representations regarding payment were false at the time they were made. Patel made these misrepresentations with the intention that Plaintiff rely upon them and refrain from taking immediate legal or enforcement action to recover the outstanding balance, thereby allowing Defendants to continue receiving genuine Sun Pharma tablets and the accompanying batch documentation necessary to sustain their counterfeiting operation.

144. Plaintiff reasonably relied on Patel's representations. In reliance on Patel's assurances that payment had been sent or was forthcoming, Plaintiff delayed enforcement of its contractual rights, continued to extend credit to Safrel, and did not immediately suspend shipments

or escalate collection efforts. Plaintiff's reliance was reasonable given the existing commercial relationship between the parties and Patel's position as the Chief Executive Officer of Safrel and Neeyaan.

145. Upon information and belief, Patel's false representations were part of and in furtherance of a broader scheme to defraud Plaintiff. By inducing Plaintiff to continue shipping genuine Cetirizine tablets and accompanying batch documentation, Patel ensured that Defendants could continue to obtain the legitimate lot numbers and COAs necessary to lend an appearance of legitimacy to their counterfeit products. Patel's fraud was therefore not merely a failure to honor a contractual payment obligation, but an independent and deliberate deception designed to facilitate Defendants' counterfeiting operation.

146. As a direct and proximate result of Patel's fraudulent misrepresentations, Plaintiff has suffered damages including, but not limited to: (1) the outstanding balance of $423,825.85 owed under the Purchase Orders, which Plaintiff would have sought to collect sooner but for Patel's false assurances; (2) the value of genuine pharmaceutical tablets and batch documentation that Plaintiff continued to ship in reliance on Patel's representations, which Defendants used to further their counterfeiting scheme; and (3) additional damages to be proven at trial, including lost sales, harm to goodwill, and reputational injury caused by the counterfeiting operation that Patel's fraud enabled.

147. Patel's conduct was willful, wanton, and undertaken in conscious disregard of Plaintiff's rights. By making deliberate misrepresentations to sustain a counterfeiting scheme that endangered public health and sought to destroy the goodwill Plaintiff had built over decades, Patel acted with the degree of culpability that warrants an award of punitive damages.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in its favor and against Defendants and grant the following relief:

A. Enter judgment in favor of Sun Pharma and against Defendants on all Counts of the Complaint;

B. Award Sun Pharma all compensatory, direct, incidental, consequential, expectation, reliance, cover, and other damages, including statutory damages under Section 43 of the Lanham Act, 15 U.S.C. § 1125, and N.J.S.A. § 56:4-1; restitution for unjust enrichment; and damages for conversion, including the fair market value of converted property; and treble damages, reasonable attorneys' fees, filing fees, and costs of suit under the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-19; and compensatory and punitive damages for common law fraud;

C. Enter an order for the disgorgement of all ill-gotten gains and profits Defendants obtained through their wrongful counterfeiting conduct, including all revenues, profits, and other benefits derived from the manufacture, marketing, and sale of counterfeit Cetirizine tablets bearing a trade dress confusingly similar, if not identical, to the Sun Pharma Trade Dress;

D. Require Defendants to:

i. Cancel all outstanding orders of the counterfeit Cetirizine tablets and refund any monies received;

ii. Notify all customers that Defendants are not authorized distributors of Sun Pharma's 10 mg Cetirizine tablets and are not associated with, sponsored by, or otherwise affiliated with Sun Pharma; and

iii. Issue a recall of all counterfeit Cetirizine tablets that Defendants have shipped to its customers.

E. Award Plaintiff costs of litigation and attorneys' fees to the full extent provided for under the law, including by Section 43 of the Lanham Act, 15 U.S.C. § 1125; Sections 34 and 35 of the Lanham Act, 15 U.S.C. §§ 1116, 1117; and

F. Such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Sun Pharma hereby demands a trial by jury on all counts so triable.

Dated: September 29, 2026

Respectfully submitted,

SUN PHARMACEUTICAL INDUSTRIES INC.

By its attorneys,

Saranne E. Weimer, Esq. (908482012)
**S. WEIMER LAW, LLC**
101 Crawfords Corner Road, Suite 4116
Holmdel, NJ 07733
sweimer@sweimerlaw.com
Phone: (732) 631-3756
Fax: (732) 398-6066

Jonathan I. Kravis
Van A. Carver
Charlotte U. Keeley
(*pro hac vice forthcoming*)
**LIU SHUR KRAVIS LLP**
607 Fourteenth Street
Washington, D.C. 20005
jonathan.kravis@lskllp.com
van.carver@lskllp.com
charlotte.keeley@lskllp.com
Phone: (202) 240-7100

*Attorneys for Plaintiff*
*Sun Pharmaceutical Industries Inc.*